IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

KAREN L. POLK,                          )
                                        )
                Plaintiff,              )
                                        )
                                        )       CIV-10-716-W
v.                                      )
                                        )
MICHAEL J. ASTRUE,                      )
  Commissioner of Social Security       )
  Administration,                       )
                                        )
                Defendant.              )

## REPORT AND RECOMMENDATION

Plaintiff seeks judicial review pursuant to 42 U.S.C. § 405(g) of the final decision of

Defendant Commissioner denying her application for disability insurance benefits under Title

II of the Social Security Act, 42 U.S.C. §§ 416(i), 423.   Defendant has answered the

Complaint and filed the administrative record (hereinafter TR___), and the parties have

briefed the issues.   The matter has been referred to the undersigned Magistrate Judge for

initial proceedings consistent with 28 U.S.C. § 636(b)(1)(B).   For the following reasons, it

is recommended that the Commissioner's decision be reversed and remanded for further

administrative proceedings.

## I. Background

Plaintiff filed her application for benefits on June 27, 2005.   In her application

Plaintiff alleged she was disabled beginning April 15, 2005, due to carpal tunnel syndrome;

neck, back, shoulder, and knee problems; depression; anxiety; ulnar nerve problem in her left arm; diabetes; "thyroidism;" anemia; and allergies. (TR 129-131, 161). At the time she filed her application, Plaintiff was employed and receiving workers' compensation benefits for on-the-job injuries. (TR 201). She later returned to her federal civil service position in October 2005 and worked until February 9, 2006. (TR 198, 201). On February 10, 2006, she retired on medical disability from her job as an aircraft electrician and decal orderer. (TR 122, 129, 161, 198). Plaintiff also previously worked as an aircraft mechanic and clerical worker. (TR 171, 189). Plaintiff reported she had completed two years of college and vocational training as an aircraft mechanic and electrician. (TR169).

Plaintiff's application was denied initially and on reconsideration. (TR 75, 76). At Plaintiff's request, an administrative hearing was conducted on June 16, 2008, before Administrative Law Judge McLean ("ALJ"), at which Plaintiff and a vocational expert ("VE") testified. (TR 20-74). At her administrative hearing, Plaintiff amended her alleged disability onset date to February 10, 2006. (TR 22). Plaintiff was 42 years old at the time she alleged she became disabled in February 2006, and she was 44 years old at the time of the hearing. (TR 25).

At her hearing, Plaintiff testified that she constantly changed positions and spent 60 to 70 percent of each day lying down or reclining because of pain in her back, shoulders, knee, ankles, feet, and hips, and pain, numbness, weakness, and tingling in her arms and wrists. (TR 40-43). Plaintiff estimated she could not lift more than ten pounds due to weakness in her hands and shoulders. (TR 44). Plaintiff testified that she was limited in her

ability to perform household chores and required assistance from her 11-year-old daughter. (TR 42, 44-45). Plaintiff stated she had been receiving mental health treatment from Dr. Noori for approximately eight months. (TR 47-48). Plaintiff described her inability to be around other people in public, irritability, and poor memory as the results of her depression. (TR 49). Plaintiff stated that she drove a car daily, watched television, cooked meals, performed some household chores, shopped for groceries twice a week, and attended church. (TR 52-63). At the time of her hearing, Plaintiff listed numerous prescribed medications she was taking on a daily basis, including anti-inflammatory, pain, muscle relaxant, anti-depressant, and anti-anxiety medications. (TR 227).

The ALJ issued a decision on August 29, 2008, in which the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act. (TR 9-19). The Appeals Council declined Plaintiff's request for review of the administrative decision. (TR 1-3). Plaintiff now seeks judicial review of the final decision of the Commissioner embodied in the ALJ's determination.

II. Standard of Review

Judicial review of this action is limited to determining whether the Commissioner's decision is based upon substantial evidence and whether the correct legal standards were applied. Emory v. Sullivan, 936 F.2d 1092, 1093 (10th Cir. 1991). "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." Musgrave v. Sullivan, 966 F.2d 1371, 1374 (10th Cir. 1992). Because "all the ALJ's required findings must be supported by substantial evidence," Haddock v. Apfel, 196

F.3d 1084, 1088 (10th Cir. 1999), the ALJ must "discuss[ ] the evidence supporting [the] decision" and must also "discuss the uncontroverted evidence [the ALJ] chooses not to rely upon, as well as significantly probative evidence [the ALJ] rejects." Clifton v. Chater, 79 F.3d 1007, 1010 (10th Cir. 1996). The court may not reweigh the evidence or substitute its judgment for that of the Commissioner. Hamilton v. Secretary of Health & Human Servs., 961 F.2d 1495, 1498 (10th Cir. 1992). However, the court must "meticulously examine the record" in order to determine whether the evidence in support of the Commissioner's decision is substantial, "taking into account whatever in the record fairly detracts from its weight." Hamlin v. Barnhart, 365 F.3d 1208, 1214 (10th Cir. 2004)(internal quotation omitted).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i). The Commissioner applies a five-step inquiry to determine whether a claimant is disabled. See 20 C.F.R. §§ 404.1520(b)-(f)(2010); see also Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005)(describing five steps in detail). In this case, the Commissioner reached the fifth and final step in the administrative evaluation process. At this step, a claimant has made a *prima facie* showing that he or she has one or more severe impairments and can no longer engage in prior work activity, and "the burden of proof shifts to the Commissioner . . . to show that the claimant retains sufficient residual functional capacity (RFC) to perform work in the

national economy, given [the claimant's] age, education, and work experience." Grogan, 399 F.3d at 1261; accord, Channel v. Heckler, 747 F.2d 577, 579 (10th Cir. 1984).

III. ALJ's Decision, Plaintiff's Claims, and Defendant's Response

Following the requisite five-step evaluation procedure, the ALJ found at step one that Plaintiff met the insured status requirements of the Social Security Act through the date of the decision and that she had not engaged in substantial gainful activity since April 15, 2005.[1] The ALJ found at step two that Plaintiff had severe impairments due to disorders of the spine, arthritis in both upper extremities and her left knee, obesity, an affective disorder, and an anxiety-related disorder. At step three, the ALJ found that Plaintiff's impairments were not disabling *per se* under the agency's Listing of Impairments.

In her step three decision, the ALJ addressed the severity of Plaintiff's mental impairments. The ALJ summarized the records of treatment of Plaintiff, the report of the consultative psychological examiner, Dr. Poyner, and the reports of the state agency psychological consultants. The ALJ also addressed the medical source statement provided by Dr. Noori dated April 11, 2008. The ALJ rejected Dr. Noori's findings that Plaintiff's mental impairments had resulted in marked functional limitations. The ALJ found that Plaintiff's mental impairments had resulted in moderate restrictions in activities of daily living, moderate difficulties in social functioning, moderate difficulties in concentration, persistence, or pace, and no episodes of decompensation. (TR 13).

---

[1]Unfortunately, the ALJ did not recognize in her decision that Plaintiff had amended her alleged onset date at the administrative hearing to February 10, 2006.

At the fourth step, the ALJ found that despite Plaintiff's severe impairments and functional limitations she had the residual functional capacity ("RFC") to perform work at the sedentary, semi-skilled level except for the following restrictions: occasional climbing, stooping, and crawling; no balancing, kneeling, or crouching; no climbing of ladders, scaffolds, or rope; no overhead reaching with both upper extremities although she could frequently reach, handle, finger, and feel with both upper extremities; and no contact with the public or performance of customer service activities. (TR 15-16). In connection with this fourth step finding, the ALJ considered the credibility of Plaintiff's allegation of disabling mental and physical limitations and symptoms. The ALJ found that Plaintiff's allegations were only partially credible and provided reasons for this credibility determination. (TR 17).

At step five, the ALJ found that Plaintiff was not capable of performing her previous jobs. (TR 17). In reliance on the VE's testimony and responses to hypothetical questioning, the ALJ found that Plaintiff retained the capacity to perform the requirements of jobs available in significant numbers in the economy, including the sedentary, unskilled jobs of weight tester, addresser, and table worker. (TR 18). Based on these findings, the ALJ concluded that Plaintiff was not disabled within the meaning of the Social Security Act.

Plaintiff contends that the ALJ failed to properly consider the opinions of her treating physician, Dr. Rosacker, and the opinion of her treating psychiatrist, Dr. Noori, and also failed to properly evaluate her credibility. Plaintiff alleges that the ALJ's RFC assessment is not supported by substantial evidence in the record showing Plaintiff had continuing carpal tunnel syndrome despite surgeries on each hand and in light of the functional assessments

of her treating physicians, Dr. Rosacker and Dr. Noori.

IV. Medical Source Opinions

Plaintiff first contends that the ALJ did not properly evaluate the medical source statements in the record provided by Dr. Rosacker and Dr. Noori. Defendant responds that no error occurred in this respect and that the Commissioner's decision should be upheld.

When an ALJ considers the opinion of a disability claimant's treating physician, the ALJ must follow a specific procedure in analyzing the medical opinion. The regulations define "medical opinions" as:

> statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions.

20 C.F.R. § 404.1527(a). Generally, an ALJ must give the opinion of an acceptable treating source controlling weight if it is both well-supported by medically acceptable clinical and laboratory diagnostic techniques and consistent with other substantial evidence in the record. Watkins v. Barnhart, 350 F.3d 1297, 1300 (10th Cir. 2003) (quoting SSR 96-2p, 1996 WL 374188, at *2).

"[I]f the opinion is deficient in either of these respects, then it is not entitled to controlling weight." Id. In that event, the ALJ must determine what weight, if any, should be given to the opinion by considering such factors as:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment

relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

Id. at 1031 (quotation omitted). See 20 C.F.R. § 404.1527(d). The ALJ "must give good reasons ... for the weight assigned to a treating physician's opinion" that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reason for that weight." Watkins, 350 F.3d at 1300 (quotations omitted). The ALJ must also set forth specific, legitimate reasons for completely rejecting an opinion of an acceptable treating source. Id. at 1301.

Plaintiff provided the agency an extensive medical record dating back to 1989. Plaintiff provided records of treatment by Dr. Rosacker, an orthopedic surgeon, from March 2005 through December 2007. (TR 424-428, 767-775). In March 2005, Plaintiff sought treatment from Dr. Rosacker for continuing carpal tunnel syndrome ("CTS") symptoms despite surgeries in 2003 and 2004 as well as pain in her neck and upper extremities. (TR 428). Dr. Rosacker noted that an x-ray of Plaintiff's cervical spine showed "very minimal" degenerative changes, and she was diagnosed with cervical facet syndrome with some radiculitis, for which anti-inflammatory medication injections in the cervical facet joint were prescribed. (TR 428). Plaintiff reported a good response from an initial injection, and the injections were continued. (TR 428). Dr. Rosacker noted in April 2005 that Plaintiff was

working and that her work activities were exaggerating her symptoms. She was given another anti-inflammatory injection and a pain medication prescription. (TR 428). The anti-inflammatory injections continued on a weekly basis for her "cervical facet arthropathy,"[2] and Plaintiff reported improvement in her symptoms in May 2005. (TR 427). Plaintiff again reported improvement with the weekly anti-inflammatory medication injections in June 2005. (TR 426). Dr. Rosacker referred Plaintiff for MRI testing, and he noted in July 2005 that Plaintiff's MRI testing did not show an impairment that could be surgically corrected. (TR 425). The anti-inflammatory medication injections were continued on a weekly basis in July 2005, and in August 2005 Dr. Rosacker noted Plaintiff was responding well to this treatment. (TR 425). However, in September 2005 Dr. Rosacker noted that Plaintiff continued to be symptomatic and would likely need anti-inflammatory medication injections intermittently for an indefinite period of time. (TR 424). Plaintiff continued to receive anti-inflammatory medication injections in September 2005 and October 2005. (TR 775). She was advised in October 2005 to return as needed as she was "doing fairly well." (TR 775). In February 2006, Plaintiff returned to Dr. Rosacker with recurrent left cervical facet arthropathy, and Dr. Rosacker noted the condition required only conservative treatment. (TR 775). In March 2006, Dr. Rosacker noted that Plaintiff would be an "ideal candidate" for vocational rehabilitation. (TR 775). Dr. Rosacker noted Plaintiff was doing well with the treatment regimen of anti-inflammatory medication injections. (TR 775).

---

[2]Cervical facet arthropathy is degenerative arthritis affecting the facet joints in the spine. http://arthritis.about.com/od/spine/p/facet_joints.htm

In April 2006, Dr. Rosacker noted that he referred Plaintiff to Dr. Moore because she was overtly depressed that day. (TR 774). Plaintiff did not show up for scheduled appointments in April and May 2006. (TR 774). She received anti-inflammatory medication injections in June 2006, and Dr. Rosacker noted Plaintiff continued to have intermittent cervical facet symptoms and trapezius and neck muscle tightness. (TR 774). Dr. Rosacker noted in July 2006 that Plaintiff was doing fairly well although her cervical facet arthropathy symptoms had recurred over the previous several days, and she was given an anti-inflammatory medication injection. (TR 773). Dr. Rosacker noted that Plaintiff exhibited good shoulder motion in August 2006. (TR 773). In August 2006, Dr. Rosacker again noted that Plaintiff was doing well with the anti-inflammatory medication injection treatment regimen and would "likely need it intermittently in the future for conservative management." (TR 773). In October and November 2006, Plaintiff returned for anti-inflammatory medication injections for continuing cervical facet arthropathy symptoms, and Dr. Rosacker noted she was doing "really quite well" with this treatment. (TR 772). In January 2007, Dr. Rosacker noted that Plaintiff complained of left-sided cervical tightness although she exhibited no real muscle spasm and no neurologic complaints or findings. (TR 772). The injections were continued in January 2007, February 2007, April 2007, May 2007, August 2007, October 2007, and December 2007. (TR 767-772).

Plaintiff was prescribed an oral anti-inflammatory medication in April 2007, and Dr. Rosacker noted in May 2007 that Plaintiff had done "quite well" with this medication, which was continued. (TR 769, 770). Dr. Rosacker noted in May 2007 that Plaintiff's symptoms

occurred on both sides with radiation of pain from the base of the skull into the shoulders, although Plaintiff had normal shoulder range of motion and her symptoms and occipital headaches had improved with the anti-inflammatory medication injections. (TR 769). Dr. Rosacker noted in December 2007 that her symptoms had recurred and she exhibited "some tenderness in the paracervical region bilaterally and some parascapular discomfort." (TR 767). Plaintiff was advised to return in two weeks for another injection although Plaintiff did not show up for her next scheduled appointment in January 2008, and there are no further records of treatment by Dr. Rosacker. (TR 767).

In a workers' compensation work capacity evaluation dated September 23, 2005, Dr. Rosacker opined that Plaintiff could sit for 5 hours, stand for 2 hours, reach for 3 hours but not over her shoulders, perform 4 hours of repetitive movements with her wrists and elbows, perform 3 hours of pushing/pulling movements, and perform 4 hours of lifting movements as a result of cervical strain, thoracic strain, bilateral shoulder strain, and bilateral shoulder impingement. (TR 494).

In a written medical source opinion of Plaintiff's RFC dated August 13, 2007, Dr. Rosacker stated that Plaintiff had been diagnosed with bilateral cervical facet arthropathy which was chronic, occipital headaches, and low back pain. (TR 824). He opined that Plaintiff could sit, stand, or walk "infrequently" (defined on the form as up to one hour), she could "frequently" (defined as 4 to 5 hours) lift or carry only two pounds, she could "infrequently" (defined as up to one hour) use her arms for reaching, pushing or pulling, she could "frequently" (defined as 4 to 5 hours) use her hands for grasping, handling , fingering,

or feeling, and that she would need to rest "as indicated above" due to pain and fatigue. (TR 824).

Other medical evidence in the record reflects that Plaintiff was diagnosed in November 1999 with left shoulder separation with ligament tear and spur formation. (TR 651). Plaintiff was treated for right shoulder impingement syndrome beginning in January 2001. (TR 577, 655). She underwent conservative treatment measures, including physical therapy, and returned to work. Plaintiff was diagnosed with work-related bilateral carpal tunnel syndrome in August 2001. (TR 562). She underwent surgery on her left wrist and left elbow performed by Dr. Hale in February 2003. (TR 415-416). She underwent surgery in May 2004 on her right wrist performed by Dr. Hale. (TR 408-409).

In October 2004, Plaintiff underwent a workers' compensation evaluation by Dr. Ellis. (TR 728-732). Dr. Ellis opined that Plaintiff had suffered cumulative trauma to her neck, back, and shoulders caused by her job as an aircraft electrician. (TR 731). At that time, Plaintiff was working as a supply technician, and Dr. Ellis opined that Plaintiff should continue in this position. (TR 732). Plaintiff underwent physical therapy in February 2005 for shoulder joint arthritis and impingement syndrome in both shoulders and carpal tunnel and cubital tunnel syndrome. (TR 404). MRI testing of her cervical spine in April 2005 was interpreted by the radiologist, Dr. Young, as showing discogenic and spondylitic changes at three levels indicating mild to moderate degree of central canal and left neuroforaminal narrowing. (TR 429-430).

In June 2005, Dr. Ellis reported to the Plaintiff's employer's workers' compensation

carrier concerning his evaluation of Plaintiff. Dr. Ellis stated that Plaintiff was diagnosed with bilateral carpal tunnel syndrome status post surgery and left cubital tunnel syndrome status post surgery. (TR 723). According to Dr. Ellis, these conditions were work-related and would cause "chronic long term problems as a result of the cumulative trauma injuries to both hands and left elbow." (TR 723).

In July 2005, Plaintiff underwent EMG testing on both hands, and the studies suggested she had residual bilateral carpal tunnel syndrome. (TR 705). In October 2005, Dr. Hale placed permanent restrictions on Plaintiff which precluded her from using vibrating tools or power tools in both arms. (TR 495). In November 2005, Dr. King stated that Plaintiff could no longer fulfill the essential functions of her position as an aircraft electrician because she could not lift more than ten pounds and had reduced grip strength, and these impairments due to bilateral carpal tunnel syndrome, bilateral ulnar neuropathy, and bilateral rotator cuff dysfunction would not improve. (TR 510).

In March 2006, Dr. Ellis reported to Plaintiff's employer's workers' compensation carrier that she exhibited decreased grip strength, decreased range of motion in her neck and upper back, and shoulders, crepitation with shoulder movement, positive impingement test in both shoulders, spasms in her cervical and thoracic spines, and decreased strength in her upper extremities. (TR 708). Dr. Ellis noted that Plaintiff's shoulder, neck, and upper back movements were painful, stiff, and slow. (TR 708). Dr. Ellis opined that Plaintiff could no longer perform the essential functions of her job and that she had been medically retired from this position in February 2006. (TR 710). He opined that Plaintiff should avoid repetitively

using her neck, upper back, and both upper extremities, she should limit any work away from her body as well as overhead work, and that clerical work would not be suitable for Plaintiff due to her neck, bilateral shoulder, and upper extremity disabilities. (TR 710).

A CAT scan of Plaintiff's cervical spine taken in December 2007 was interpreted by the radiologist, Dr. Battiste, as showing "spurring suggestive of ankylosing spondylitis" at one level. (TR 790). Dr. Codding, a rheumatologist to whom Plaintiff was referred by her treating physician, Dr. Dycus, opined in February 2008 that Plaintiff had cervical disc disease with upper extremity features of nerve entrapment. (TR 779). Dr. Codding opined that Plaintiff also had mild thoracic scoliosis which was causing increased physical stress on the spine, significant lumbar disc disease which was "severe" with "arthritis throughout" the facets of the lumbar spine, and "really bad" left knee osteoarthritis as shown on lumbar and left knee MRI testing. (TR 779). Dr. Codding noted Plaintiff was advised to increase her activity level in order to lose weight before undergoing back surgery to relieve her "significant two-level disc disease." (TR 779). He advised that he would prescribe pain medications for Plaintiff to help her be more active, and he continued her muscle relaxer, pain, and anti-inflammatory medications. (TR 779).

The ALJ recognized that Dr. Rosacker expressed a medical opinion in August 2007 concerning Plaintiff's RFC for work. The ALJ did not recognize that Dr. Rosacker completed an earlier work-capacity evaluation for Plaintiff in 2005, and the ALJ failed to analyze either of these opinions under the proper standard for evaluating medical source statements. See Krauser v. Astrue, __ F.3d __, 2011 WL 1718892, *4 (10th Cir. 2011)("Our

case law, the applicable regulations, and the Commissioner's pertinent Social Security Ruling (SSR) all make clear that in evaluating the medical opinions of a claimant's treating physician, the ALJ must complete a sequential two-step inquiry, each step of which is analytically distinct. . . . [P]ost-hoc efforts of the Commissioner . . . to work through the omitted [steps] for the ALJ are prohibited . . . .").

The record also contains records of treatment of Plaintiff by Dr. Noori and other mental health professionals. On October 2, 2006, Plaintiff sought treatment through St. Anthony Hospital from a psychiatrist whose signature is unintelligible. (TR 735-740). She was diagnosed in October 2006 with major depressive disorder, single episode, and anti-depressant medication was prescribed. (TR 736). She returned to the physician for treatment and medication adjustments in December 2006, January 2007, March 2007, April 2007, and July 2007, when the psychiatrist advised Plaintiff he/she had been terminated and referred Plaintiff to another psychiatrist for further mental health treatment. (TR 758-762).

In October 2007, Plaintiff sought treatment from Dr. Noori. (TR 822). Plaintiff reported she was experiencing depression, anhedonia, difficulty with concentration, poor coping skills, rages, and easy irritability. (TR 822). Plaintiff stated that she had been under the care of another psychiatrist for a year and that she was taking anti-anxiety, anti-depressant, hypothyroid, and anti-inflammatory medications. (TR 823). In November 2007, Dr. Noori diagnosed Plaintiff with mood disorder not otherwise specified ("NOS") and prescribed Plaintiff two additional anti-depressant medications. (TR 820-821). In February 2008, Dr. Noori noted that Plaintiff exhibited slow and pressured speech, dysphoric and

anxious mood, labile affect, poor judgment, fair insight, and resistant attitude. (TR 819). In April 2008, Dr. Noori noted that Plaintiff's medications were adjusted and she exhibited slow speech, dysphoric mood, labile affect, and fair judgment. (TR 818). Plaintiff reported decreased sleep. (TR 818).

On April 11, 2008, Dr. Noori completed a medical source opinions of Plaintiff's ability to perform mental work-related activities. (TR 825-826). On this form, the psychiatrist opined that Plaintiff would be moderately limited (defined on the form as unable to perform the task 33 % of the time) in five functional areas, including her ability to remember locations and work-like procedures, her ability to understand and remember detailed instructions, her ability to maintain attention and concentration for extended periods in order to perform simple or detailed tasks, her ability to work close to others without being distracted, and her ability to interact appropriately with the public. (TR 825-826). Dr. Noori opined that Plaintiff would be markedly limited (defined on the form as unable to perform the task up to 66 % of the time) in four functional areas, including her ability to adhere to a schedule and maintain regular attendance, her ability to perform at a consistent pace without an unreasonable number or length of rest periods, her ability to handle normal work stress, and her ability to accept instructions and criticism from supervisors. (TR 825-826). On this form, Dr. Noori stated that Plaintiff had been treated in four office visits prior to the date of the statement and that her symptoms included memory difficulties, sleep disturbance, social withdrawal or isolation, blunt, flat, or inappropriate affect, feelings of guilt/worthlessness, generalized persistent anxiety, mood disturbance, emotional lability, decreased energy,

16

anhedonia or pervasive loss of interests, and difficulty concentrating or thinking. (TR 827).

At her hearing, Plaintiff testified that she was anxious around other people and that she was being treated for depression by Dr. Noori and was previously treated by a doctor at St. Anthony's Hospital. (TR 47). Plaintiff testified that she was easily irritated and upset, experienced outbursts, wanted to be alone, had difficulty remembering and concentrating, and tended to "hide" and "escape" from stressful situations. (TR 48-49). Plaintiff testified that she had recently quit her church's choir because she could not stand up and had difficulty dealing with other people. (TR 60).

Although the ALJ misspelled Dr. Noori's name, the ALJ recognized in her decision that Dr. Noori was a treating physician and that Dr. Noori had submitted a medical source statement of Plaintiff's mental RFC for work. The ALJ rejected Dr. Noori's opinion that Plaintiff's mental impairment had resulted in marked functional limitations. The ALJ reasoned that this portion of Dr. Noori's medical opinion was

> inconsistent with the remainder of the medical evidence of record. The claimant has been under the care of a number of physicians for a number of years. The treatment records do not suggest the claimant misses appointments without explanation or that she is tardy for appointments. Furthermore, the claimant attended more than two dozen physical therapy appointments without apparent difficulty. The claimant appeared for her consultative examinations. The claimant completed a functional capacity evaluation at the suggestion of her treating physician, Dr. Rosacker. Again, her attendance and promptness were not an issue. On the few occasions the claimant saw Dr. Noor [sic] prior to completion of the opinion, her attendance or timeliness does not appear to have been an issue. While Dr. Noor [sic] may be an expert in the area of psychiatry, the claimant's ability and tendency to be prompt and punctual for her many doctors'

> appointments are inconsistent with Dr. Noor's [sic] opinion
> regarding 'marked' limitations from affective disorder.

(TR 12-13).

This is the extent of the ALJ's evaluation of Dr. Noori's medical source opinion, and it is clearly deficient under the governing standard. The ALJ specifically rejected only Dr. Noori's finding that Plaintiff would be markedly limited in her ability to adhere to a schedule and maintain regular attendance. The ALJ relied entirely on the record of Plaintiff's attendance of doctors' and physical therapy appointments as the rationale for rejecting Dr. Noori's opinion. However, the fact that a claimant has attended doctors' appointments (and Dr. Rosacker's records reflect that Plaintiff did miss appointments) on a weekly or monthly basis does not support any inference that the claimant had the functional ability to regularly attend work on a daily basis. The ALJ also pointed to Plaintiff's attendance of "two dozen physical therapy appointments." (TR 13). The ALJ does not refer to specific pages in the record with respect to this statement. The only record evidence of Plaintiff's attendance of multiple physical therapy sessions occurred in 2003, long before Plaintiff alleged her disability began. (TR 228-244). The ALJ merely lumped together the remaining findings by Dr. Noori of marked functional limitations and provided no evaluation of those findings. The ALJ did not provide legitimate reasons for rejecting Dr. Noori's findings of marked functional limitations resulting from Plaintiff's mental impairments. Moreover, the ALJ did not indicate whether she accepted or rejected Dr. Noori's findings of moderate functional limitations or what weight she gave to those findings. These errors in the ALJ's evaluation

of treating physicians' opinions warrant a reversal and remand of the Commissioner's decision for further administrative proceedings.

V. Credibility

In her step four decision, the ALJ discredited Plaintiff's statements regarding the severity of her mental and physical impairments. In support of this credibility determination, the ALJ reasoned that Plaintiff

> has not received the sort of psychotherapy one might expect for such allegedly severe mental impairment. The claimant has seen numerous physicians who note complaints of depression; however she has not required hospitalization for her condition or for treatment of anxiety. The evidence substantiates a conclusion that the claimant responds favorably to prescribed medication when taken as prescribed and that her symptoms can be somewhat abated. The claimant's performance on the functional capacity evaluation produced unreliable results. This reflects poorly on her credibility. The claimant's demonstration of self-limiting behavior leaves the undersigned with an unfavorable impression of the claimant.

(TR 17). Plaintiff contends that the ALJ's credibility determination was deficient because the ALJ relied on the fact she had not been hospitalized for mental health treatment and "[i]n effect the ALJ is saying that a person with a mental condition that prevents competitive employment would need to be hospitalized." Plaintiff's Opening Brief, at 9. However, an ALJ may consider the consistency between the claimant's allegations and the objective medical evidence in determining credibility. See Hargis v. Sullivan, 945 F.2d 1482, 1489 (10th Cir. 1991)(reciting factors that should be considered in determining credibility of subjective statements, including "the consistency or compatibility of nonmedical testimony

with objective medical evidence"). The record shows that Plaintiff has been prescribed anti-depressant and anti-anxiety medications but she has not undergone extensive mental health treatment. The ALJ did not err in this regard.

The ALJ's reference to a functional capacity evaluation of Plaintiff is apparently a reference to an evaluation conducted by a physical therapist in September 2005. In this evaluation, the therapist reported that the functional capacity test revealed Plaintiff could perform the requirements of light work (defined in the report as occasionally lifting up to 20 pounds and frequently lifting up to 10 pounds) and that Plaintiff's "performance-limiting behaviors" during the testing "were enough to classify [Plaintiff's] overall test as unreliable." (TR 421). The therapist noted that the "possible performance limiting behaviors" were demonstrated almost entirely on grip testing. (TR 422). There is no indication that the therapist who conducted this functional evaluation was aware of Plaintiff's post-surgical diagnosis of residual bilateral carpal tunnel syndrome. Nor is there any indication that the therapist considered whether that diagnosis could account for at least some of the "performance-limiting behaviors" reported by the physical therapist. There is evidence in the record, most recently in an October 2007 physical examination of Plaintiff by Dr. Codding, that Plaintiff exhibited moderately reduced grip strength, strong Phalen's and Tinel's testing (for the presence of carpal tunnel syndrome) in both hands, nerve entrapment findings in the lateral epicondyle on both upper extremities and in the medial epicondyle on the right, and strong radial nerve compression testing in both forearms. (TR 794). Because subsequent medical evidence revealed that Plaintiff's grip strength was reduced and that she

20

exhibited signs of continuing carpal tunnel syndrome, the ALJ erred in relying on the physical therapist's reported of "possible performance limiting behaviors" in a one-time consultative evaluation as a reason for discounting her credibility.

The ALJ must, of course, set forth "'specific reasons for the finding on credibility, supported by the evidence in the case record' and be 'sufficiently specific' to inform subsequent reviewers of both the weight the ALJ gave to a claimant's statements and the reasons for that weight." Hayden v. Barnhart, 374 F.3d 986, 992 (10th Cir. 2004)(quoting Social Security Ruling 96-7p). Additionally, "findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995). The ALJ did not specify what testimony of Plaintiff's she found to be not credible. The ALJ merely stated conclusions without providing sufficient references to contrary or supporting evidence in the record. In this case, the objective evidence reveals that Plaintiff has multiple pain-causing impairments, including "severe" and "significant" lumbar disc disease and severe osteoarthritis in her left knee, as well as cervical disc disease with nerve entrapment. (TR 779). Her treating physicians have placed restrictions on her work-related activities that indicate she is significantly limited both physically and mentally. The ALJ's brief, conclusory credibility determination is not supportable under these circumstances.

## RECOMMENDATION

In view of the foregoing findings, it is recommended that judgment enter

REVERSING the decision of the Commissioner and REMANDING the decision for further administrative proceedings consistent with the findings herein. The parties are advised of their respective right to file an objection to this Report and Recommendation with the Clerk of this Court on or before _____ June 13th, 2011, in accordance with 28 U.S.C. § 636 and Fed. R. Civ. P. 72. The failure to timely object to this Report and Recommendation would waive appellate review of the recommended ruling. Moore v. United States, 950 F.2d 656 (10th Cir. 1991); cf. Marshall v. Chater, 75 F.3d 1421, 1426 (10th Cir. 1996)("Issues raised for the first time in objections to the magistrate judge's recommendation are deemed waived.").

This Report and Recommendation disposes of all issues referred to the undersigned Magistrate Judge in the captioned matter, and any pending motion not specifically addressed herein is denied.

ENTERED this ____ 24th ____ day of ____ May ____, 2011.


GARY M. PURCELL
UNITED STATES MAGISTRATE JUDGE